David Pierce (SBN 150231)
dpierce@dhpierce.com
Larry Liu (SBN 175799)
lliu@dhpierce.com
Shih-Chieh Wang (SBN 329518)
jwang@dhpierce.com
**DAVID H. PIERCE & ASSOCIATES PC**
15260 Ventura Boulevard, Suite 730
Sherman Oaks, CA 91403
Tel: (818) 826-5480
Fax: (818) 826-5486

Attorneys for Plaintiff
ELIE SAKAYAN

THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIE SAKAYAN, an individual,<br><br>Plaintiff,<br><br>v.<br><br>HARRY ZHABILOV, an individual, ENZOLYTICS, INC., a Delaware corporation; IMMUNOTECH LABORATORIES, INC., a Nevada Corporation, and DOES 1 – 50,<br><br>Defendants. | Case No. 2:22-cv-06618-MWF-SK<br><br>**DECLARATION OF LARRY LIU** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **DECLARATION OF LARRY LIU**

I, Larry Liu, declare:

1.      I am an attorney at David H. Pierce & Associates, counsel for Plaintiff Elie Sakayan, and if called to testify, I could and would testify competently thereto.

2.      Plaintiff and our office first learned about the incorporations, mergers, and names changes involving Enzolytics, Inc., ENZC Sub, Inc., Enzolytics Merger Corp., and Robustmed, Inc., after Defendants production of documents on December 23, 2023.

3.      Attached as Exhibit A is a letter from Jackson Morris to Harry Zhabilov, dated March 18, 2016, and produced by Defendants, which states: "I understand Immunotech intends to file a registration statement on Form 10 . . . ."

4.      Attached as Exhibit B is Immunotech Laboratories, Inc.'s Financial Report for the years ending December 31, 2016 and December 31, 2015, produced by Defendants.

5.      Despite a request for all corporate records related to Immunotech, Inc., Defendants have not produced any meeting minutes or other documentation showing that a vote by the shareholders was held to approve the Asset Purchase Agreement.

Executed this 18th day of March 2024, at Rancho Palos Verdes, California.

_____
Larry Liu

2

# Exhibit A

# JACKSON L. MORRIS

## Attorney at Law
### Admitted in Florida and Georgia

March 18, 2016
By e-mail to DowJonesLink@gmail.com

Harry Zhabilov
Chief Executive Officer
Immunotech Laboratories, Inc.
120 West Pomona Avenue
Monrovia, CA 91016

Re:  Legal services engagement

Dear Harry:

Thank you for the opportunity to be considered to provide legal services to Immunotech Laboratories, Inc., a Nevada corporation ("Immunotech").  Immunotech's common stock is publicly traded under the symbol IMMB.  Immunotech is delinquent in publishing current information on OTCMarkets via the OTC Disclosure and News Service.  I understand Immunotech intends to file a registration statement on Form 10, under the Securities Exchange Act of 1934, for the purpose of registering its common stock under the '34 Act.  This letter outlines the scope of my services and fees.

1.  *General corporate services*.  At your request, I will provide advice on general corporation law matters under the law of Immunotech's state of incorporation, drafts and final minutes of meetings or actions by written consent of the board of directors and, when appropriate, stockholders, for approval of actions and transactions to be taken by Immunotech requiring board and stockholder approval, including preparation of charter amendments.  Filing of charter amendments will be Immunotechs' responsibility.   In the event Immunotech engages general counsel in California, Nevada or elsewhere who may provide some or all of the forgoing general corporate services, I will coordinate with and advise that counsel.

2.  *Securities registration and related services*.  I will provide drafting and review services, including editing provided materials, revision to client satisfaction and regulatory compliance, for an initial registration statement (and amendments) to be filed with the U.S. Securities and Exchange Commission on Form 10.  In this connection, I will also review supporting documentation for the purpose of assuring, with your advice, the accuracy of material disclosures related to the underlying corporate and contractual documentation and transactions.  I will advise you regarding appropriate responses to comments received from the SEC staff, prepare revisions for amendments of the registration statement for your review and approval and prepare response letters to non-accounting staff comments.  You will provide to me the information and exhibits to be included in the registration statement in accordance with the requirements of Form 10 and Regulation S-K, together with audited annual and unaudited interim financial statements.

3.  *FINRA related services*.  I will assist with your communication with the Financial Industry Regulatory Authority and your transfer agent in connection with FINRA's processing of any applications for market notifications Immunotech may be required to have made.

3116 West North A Street ◆ Tampa, Florida  33609-1544
813·874·8854  ◆  Cell 813·892·5969  ◆  Fax 800·310·1695  ◆  Skype jackson.morris.tampa
e-mail:  jackson.morris@rule144solution.com;  jackson.morris@verizon.net
RULE144*Solution*.com

4

Harry Zhabilov, Chief Executive Officer
Immunotech Laboratories, Inc.
March 18, 2016
Page 2

4.  *Exchange listing services*.  In the event Immunotech decides to seek a listing on a national exchange and is eligible for such listing, I will assist with the application process.

Elie has asked that I accept my fee for the foregoing services in shares of Immunotech's common stock.  I am willing to accept in payment for my services shares of Immunotech's common stock equal to one percent of the issued and outstanding share, computed following such issue.  Based on Elie's confirmation of the number of shares now issued and outstanding, my fee would be 5,560,252 shares fully earned at the date of engagement.  The shares may be issued in book entry form.  I will advise Pacific Stock Transfer of address for registration and my social security number.  The instructions for the issue to Pacific, with copy to me, must be irrevocable

I am also available to provide legal services subsequent to the effective date of the Form 10 and the SEC's satisfaction with the disclosures therein, including subsequent SEC reports on a case by case basis at fees to be determined.

Because I utilize e-mail, electronic document distribution, flat-rate long distance telephone service and Skype, I do not anticipate incurring reimbursable expenses.  In the event Immunotech requires paper-copy distribution, priority or express mail or overnight courier service, Immunotech will provide its own account number for my use or promptly reimburse my out-of-pocket costs.  If I am required to travel to attend meetings or for due diligence purposes, Immunotech will provide airline tickets, hotels and rental cars on its credit, and promptly reimburse incidental out-of-pocket expenses, such as meals and ground transportation.

Immunotech will be responsible for all filing and registration fees, transfer agent fees, EDGAR agent fees, printing and copies, auditor's fees, business valuation fees, state corporate filing fees and all other costs and expenses of whatever nature or for whatever purpose.  In the event legal counsel with specialized expertise that I cannot provide is required, for example, in the areas of intellectual property, FDA, OSHA, IRISA and employment law, Immunotech will engage such counsel at my request and will be responsible for such legal fees and costs.

If you would like to discuss the terms of my engagement, please give me a call.  If these terms are acceptable, please countersign this letter and return it to me either by telephone facsimile (see bottom of the first page) or scan to .pdf and e-mail.

Very truly yours,

Jackson L. Morris

Accepted March _____, 2016:

Immunotech Laboratories, Inc.

By: _____
        Harry Zhabilov, Chief Executive Officer

# Exhibit B

# Immunotech Laboratories, Inc.

## (A Development Stage Company)

Initial Information Disclosure Statement

For the Period Ending December 31, 2016

(OTC Grey: IMMB) OTC Grey

## Part. A General Company Information

**Item 1). Name of the issuer and its predecessors (if any)**

Immunotech Laboratories, Inc., a Nevada corporation (hereinafter referred to as the "Company", "we", "us", or "our" or "the Issuer").

a) Incorporated in the State of Nevada on April 11, 2000 under the name of "Earthnet Media.com".

b) On April 8, 2001, changed its name to "Earthnet Media,Inc."

c) On October 18, 2006, changed its name to "International Technology Systems, Inc." and traded under the symbol ITYS

d) On December 15, 2008, the Company effected a reverse merger with Immunotech Laboratories, Inc. and on December 18, 2008 changed its name to Immunotech Laboratories, Inc. trading under the symbol IMMB.

**Item 2). Address**

Company Headquarters Address:

120 W Pomona Ave

Monrovia, CA 91016

Phone: (626) 538-4779

Fax: (626) 538-4779

Email: immunotechlabs@gmail.com

Website:  http//www.immunotechlab.com

IR Contact :

Harry Zhabilov

120 W Pomona Ave

Monrovia, CA 91016

Phone: (626) 538-4779

Fax: (626) 538-4779


**Item 3). The exact title and class of securities outstanding**

Trading Symbol: IMMB

Exact title and class of securities outstanding:  Common Stock

CUSIP Number: 45254F203

Par or Stated Value:     $0.001

Total shares authorized:     800,000,000 as of: January 16, 2017

Total shares outstanding:    576,964,967 as of: January 16, 2017

Additional class of securities:

Exact title and class of securities outstanding: Series A Convertible Preferred Stock

CUSIP:  45254F203

Par or Stated Value:     $0.001

Total shares authorized:    60,000,000 as of: January 16, 2017

Total shares issued:     60,000,000 as of: January 16, 2017

Exact title and class of securities outstanding: Series B Convertible Preferred Stock

CUSIP:  45254F203

Par or Stated Value:     $0.001

Total shares authorized:    200,000,000 as of: January 16, 2017

Total shares issued:     200,000,000   as of: January 16, 2017

<u>Transfer Agent</u>

Name:   Pacific Stock Transfer Company Address 1:  4045 South Spencer Street, Suite 403 Address 2:  Las Vegas, NV 89119 Address 3:   Phone:  (702) 361-3033

The Transfer Agent is registered under the Exchange Act.

Shares which are not currently held in street name are "restricted securities" which cannot be sold into the public securities markets unless sold in compliance with Rule 144 or Section 4(a)(1) of the securities Act of 1933 or subject to an effective registration statement filed under that Act. Our stockholders are not eligible to use Rule 144until we have satisfied Rule 144(i)(2) with respect to previous shell companies.

There have been no trading suspension orders issued by the SEC in the past twelve months.

There have been no stock split, stock dividend, recapitalization, merger, acquisition, spin-off, or reorganization either currently anticipated or that occurred within the past 12 months.

**Item 4).  Issuance History**

A.  The Company has not offered any shares through a registration. All shares have been issued for services or by subscription agreement.

B.  There have been no jurisdictions where an offering was registered or qualified.

C.  No shares have been offered.

D.  There have been no shares sold by a registration.

E.  The price at which the shares were offered, and the amount actually paid to the issuer; none by registration

F.  The trading status of the shares;  N/A

G.  No shares were issued under a registration. All shares issued for services and by subscription were issued with a legend in accordance with SEC Regulations.

H.  The following shares were Issued for Services rendered; On April 3, 2014 the Company issued 3,000,000 and 22,625,900 shares of Common Stock to Vrej Khacachadurin and LA Financial Equities respectively in the settlement of a single claim, Blaine Nabors was issued 750,000 shares on May 9, 2014 for consulting services and 40,000,000 shares to

Elie Sakayan on May 19, 2014 for services rendered in association with the Bulgarian field Trials. On July 19, 2014 the Company issued 7,404,400 for services rendered under an employment contract. On August 20, 2014 the Company issued 3,766,120 and 3,400,000 shares to Camelot financial Group, Inc.  and Uncommoncents, Inc. for consulting services rendered during the quarter ended September 30, 2014. On November 9, 2015 Luchezar Ivanov and Kamelya Tsoklinova were each issued  2,500,000 shares for consulting services. On February 16, 2016, the Company issued 3,000,000 to Baja Trip & Associates for consulting services. The Company issued 5,000,000 shares on March 29, 2016 for consulting services in association with the development of its website to K. Lliev.

I.   The following shares were Issued for Cash; On September 30, 2015 the Company issued 3,500,000 shares under a subscription agreements to Denica Gadgeva for $3,000. On December 15,2015 the Company issued 5,500,000 shares to Bryan Andrew Davis under a subscription agreement. M. Matseva and L. Matseva  were issued 1,000,000 shares under two separate subscription agreements for a total of $4,200 on March 29, 2016 and Dow Jones Link was issued 500,000 shares in exchange for a direct payment to the Company's vendor of $500.00 on the same date.

**Item 5). Financial Statements**

    A.  Balance sheet;
    B.  Statement of income;
    C.  Statement of cash flows; and
    D.  Financial notes;

# Immunotech Laboratories, Inc.

# Financial Statements

**For the years ending December 31, 2016 and December 31, 2015**

**(Unaudited)**

**Immunotech Laboratories, Inc.**
**(Formally International Technology Systems, Inc.)**
**Balance Sheets**
**December 31, 2016 and December 31, 2015**

| | | | 12/31/2016 | | 12/31/2015 |
|---|---|---|---|---|---|
| **(Unaudited)** | | | | | |
| **Assets** | | | | | |
| Current assets: | | | | | |
|    Cash | | $ | 14,293 | $ | 5,055 |
| Total current assets | | $ | 14,293 | $ | 5,055 |
| | | | | | |
| Plant, Property and Equipment, net | | $ | 305,007 | $ | 321,355 |
| Intangible Assets | | $ | 10,013,860 | $ | 10,013,860 |
| Investment in Immunotech Laboratories BG | | $ | 200,000 | $ | 200,000 |
| | | | | | |
|    Total assets | | $ | 10,533,160 | $ | 10,540,270 |
| | | | | | |
| **Liabilities and Stockholders'  Equity** | | | | | |
| Current liabilities: | | | | | |
|    Accounts payable | | $ | 312,200 | $ | 162,200 |
|    Accrued wages | | $ | 1,344,381 | $ | 1,055,177 |
|    Accrued interest | | $ | 109,307 | $ | 86,639 |
|    Other current liabilities | | $ | 1,550,000 | $ | 1,550,000 |
|    Due to shareholders | | $ | 772,889 | $ | 761,542 |
| Total current liabilities | | $ | 4,088,777 | $ | 3,615,558 |
| Long term debt | | $ | 1,645,524 | $ | 1,645,524 |
|    Total liabilities | | $ | 5,734,301 | $ | 5,261,082 |
| Stockholders' equity | | | | | |
|    Series A Preferred stock, $.001 par value; 50,000,000 shares authorized and issued and outstanding at December 31, 2016 and December 31, 2015. Series B Preferred, $.001par value 200,000,000 authorized and issued at December 31, 2016 and December 31, 2015. | | $ | 260,000 | $ | 260,000 |
|    Common stock, $.001 par value; authorized 800,000,000 and 576,964,967 shares and 564,464,967 shares issued and outstanding at December 31, 2016 and December 31, 2015. | | $ | 574,965 | $ | 564,465 |
|    Additional paid-in capital | | $ | 7,964,044 | $ | 7,961,844 |
|    Retained Earnings /(Deficit) | | $ | (4,000,150) | $ | (3,507,121) |
| | | | | | |
|    Total stockholders 'deficiency | | $ | 4,798,859 | $ | 5,279,188 |
| | | | | | |
| Total liabilities and stockholders' equity | | $ | 10,533,160 | $ | 10,540,270 |

*See accompanying notes to financial statements*

**Immunotech Laboratories, Inc.**
**(Formally International Technology Systems, Inc.)**
**Statements of Operations**

**For the Three and Twelve Months Ended December 31, 2016 and December 31, 2015**

|  | Twelve Months Ended | | Three Months Ended | |
|---|---|---|---|---|
| **(Unaudited)** | 12/31/2016 | 12/31/2015 | 12/31/2016 | 12/31/2015 |
| Revenue | | | | |
| Costs of sales | $  289,205 | $  289,205 | $  72,301 | $  72,301 |
| Gross profit | $ (289,205) | $ (289,205) | $  (72,301) | $  (72,301) |
| | | | | |
| Expenses: | | | | |
| General and administrative | $  164,808 | $  187,647 | $  37,548 | $  54,638 |
| Depreciation | $  16,348 | $  16,348 | $  4,087 | $  4,087 |
| | | | | |
| Total expenses | $  181,156 | $  203,995 | $  41,635 | $  58,725 |
| | | | | |
| Income (loss) from continuing operations before other (income)  and expense | $ (470,361) | $ (493,200) | $ (113,936) | $ (131,026) |
| | | | | |
| Interest expense, net of interest income | $  22,668 | $  22,788 | $  5,667 | $  5,667 |
| Other (income) expense | $ | $ | $ | $ |
| Total other (income) and expense | $  22,668 | $  22,788 | $  5,667 | $  5,667 |
| | | | | |
| Income (loss) from continuing operations before income taxes | $ (493,029) | $ (515,988) | $ (119,603) | $ (136,693) |
| | | | | |
| Income taxes | | | | |
| | | | | |
| Net income (loss) | $ (493,209) | $ (515,988) | $ (119,603) | $ (136,693) |

*See accompanying notes to financial statements*

13

**Immunotech Laboratories, Inc.**
**(Formally International Technology Systems, Inc.)**
**Statement of Cash Flow**
**For the Twelve Months Ended December 31, 2016 and**
**December 31, 2015**

| **(Unaudited)** | Twelve Months Ended 12/31/2016 | | Twelve Months Ended 12/31/2015 | |
|---|---|---|---|---|
| OPERATING ACTIVITIES | | | | |
| Net Income | $ | (493,029) | $ | (515,988) |
| Adjustments to reconcile Net Income | | | | |
| to net cash provided by operations: | | | | |
| Accounts Payable | $ | 150,000 | $ | 148,964 |
| Accrued Interest | $ | 22,668 | $ | 22,668 |
| Accrued Wages Payable | $ | 289,205 | $ | 289,206 |
| Net cash provided by Operating Activities | $ | (31,156) | $ | (55,151) |
| | | | | |
| INVESTING ACTIVITIES | | | | |
| Accumulated Depreciation | $ | 16,348 | $ | 16,348 |
| Equipment | | | | |
| | | | | |
| Net cash provided by Investing Activities | $ | 16,348 | $ | 16,348 |
| | | | | |
| FINANCING ACTIVITIES | | | | |
| | | | | |
| Investor Loans | $ | 11,346 | $ | 29,720 |
| Common Shares Issued | $ | 12,700 | $ | 14,000 |
| Decrease in Long Term Debt | | | | |
| Net cash provided by Financing Activities | $ | 24,046 | $ | 43,720 |
| | $ | 9.238 | $ | 4,917 |
| Cash at beginning of period | $ | 5,055 | $ | 138 |
| Cash at end of period | $ | 14,293 | $ | 5,055 |

*See accompanying notes to financial statements*

**Immunotech Laboratories, Inc.**
**(formerly International Technology Systems, Inc.)**
**Notes to the Financial Statements**
**The Year Ended December 31, 2016 and December 31, 2015**
**(Unaudited)**

### 1.  Organization

Immunotech Laboratories, Inc. (the "registrant", "Company," "we", "us", "our", or "Immunotech") (IMMB) is the successor entity to International Technology Systems, Inc. ("ITSY"), a Nevada corporation, which was established in  2000. In 2009 Immunotech Laboratories, Inc. acquired the Company in a reverse merger with Immunotech being the surviving entity. The Company is a calendar year corporation.

From 2000 to 2009 the Company operated as a research and development company in the Telecommunication Industry, primarily with International Telecommunication firms. In 2009 after the reverse merger with Immunotech the Company re-focused its efforts on Research and Development in the Bio-Tech Field as a drug development company committed to the commercialization of its proprietary proteins known as IRREVERSIBLE PEPSIN FRACTION (IPF) ITV-1 for the treatment of debilitating infectious disease such as HIV and Hepatitis Type C. These drugs have not been approved by the FDA but the Company has begun pre-clinical trial testing. The Company has also began the final phase of clinical trials during the period ended March 31, 2016 in Bulgaria through a minority owned entity, Immunotech Laboratories, BG ("ILBG")  which IMMB owns 49%. The Clinical Trials were successfully completed  Bulgaria in the fourth quarter of 2016.

In pursuit of this strategy, on December, 2009 Immunotech Laboratories, Inc. Corp. (the "Registrant," Immunotech," or the "Company") entered into a Licensing Agreement (the "Agreement"), with the Zhavilov Trust, a California Trust ("Z Trust" or the "Seller") and the Trustees of the Z Trust ("Trustees").  Pursuant to the terms of the Agreement, IMMB agreed to pay $1,550,000.00 Licensing fee to the Trust for exclusive rights to the Patent for proteins to be used to develop a drug treatment for HIV. The exclusivity is for a period of 20 years with approximately 12 years remaining.

### 2. Basis of Presentation

The financial statements as of and for the years ended December 31, 2016 and year ended December 31, 2015 have been prepared by the Company pursuant to the rules and regulations of the Securities and Exchange Commission (the "SEC") for financial reporting. These statements, in the opinion of management, include all adjustments (consisting of normal recurring adjustments and accruals) necessary for a fair statement for the periods presented.

### 3. Summary of Significant Accounting Policies

In July 2009, the FASB Accounting Standards Codification (the "Codification") officially became the single source of authoritative nongovernmental U.S. GAAP, superseding existing FASB, American Institute of Certified Public Accountants, Emerging Issues Task Force, and related accounting literature. Going forward, only one level of authoritative GAAP will exist. All other accounting literature will be considered non-authoritative.

**Use of Estimates**

The preparation of financial statements in conformity with generally accepted accounting principles requires management to make estimates and assumptions that affect reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statement and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from the estimates.

**Cash and Cash Equivalents**

For financial statement presentation purposes, those short-term, highly liquid investments with original maturities of three months or less are considered to be cash or cash equivalents.

**Accounts Receivable**

The Company does not have Accounts Receivable at this stage of development of its product but expects at the completion of field testing of the treatments and approval of the FDA and/or the issuance of the permit in Bulgaria will extend credit to its customers in the normal course of business. It is expected that the Company will perform ongoing credit evaluations of its customers, maintaining allowances for potential credit losses which, when realized, have been within management's expectations. The allowance method will be used to account for uncollectible amounts. The evaluation, when prepared,  is inherently subjective, and it will require estimates that are susceptible to significant revision as more information becomes available. Allowance for doubtful accounts was $0 for both 12-31-2016 and 12-31-2015.

**Revenue Recognition**

The Company did not have revenues in the years ending December 31, 2016 and December 31, 2015.

**Property, Plant and Equipment**

Property and equipment are reported at cost less accumulated depreciation.  Depreciation is computed using the straight-line method over the estimated useful lives of the assets. Lives for property, plant and equipment are as follows: machinery and equipment—5 to 15 years; furniture and fixtures—3 to 10 years; computer hardware and software 3 to 7 years. Routine maintenance costs are expensed as incurred. Expenditures for renewals and betterments are capitalized. The cost and related accumulated depreciation of assets retired or sold are removed from the accounts and gains or losses are recognized in operations.  For the years ending December 31, 2016 and  December 31, 2015, the Company recorded $16,348 and $16,348 in depreciation expense, respectively.

**Valuation of Intangibles and Other Long Lived Assets**

The recoverability of long-lived assets, including equipment and intangible assets, is reviewed when events or changes in circumstances occur that indicate that the carrying value of the asset may not be recoverable. The assessment of possible impairment is based on the ability to recover the carrying value of the asset from the expected future pre-tax cash flows (undiscounted and without interest charges) of the related operations. If these cash flows are less than the carrying value of such asset, an impairment loss is recognized for the difference between estimated fair value and carrying value. The primary measure of fair value is based on discounted cash flows. The measurement of impairment requires management to make estimates of these cash flows related to long-lived assets, as well as other fair value determinations.  There have been no adjustments to the intangible assets of the company since the acquisition of the exclusive license for the treatment or the 49% interest in IMMB BG.

**Fair Value of Financial Instruments**

Fair value estimates discussed herein are based upon certain market assumptions and pertinent information available to management as of December 31, 2016. The respective carrying value of certain on-balance sheet financial instruments approximated their fair values. These financial instruments include cash and cash equivalents, accounts receivable, accounts payable, line of credit, and accrued expenses. Fair values were assumed to approximate carrying values for these financial instruments since they are short-term in nature and their carrying amounts approximate fair values or they are receivable or payable on demand.

**Stock Based Compensation**

Stock based awards are accounted for according to the provisions of FASB ASC 718. Our primary type of share-based compensation consists of stock options. We use the Black-Scholes option pricing model in valuing options. The inputs for the valuation analysis of the options include the market value of the Company's common stock, the estimated volatility of the Company's common stock, the exercise price of the warrants and the risk free interest rate.

**Fair Value Measurements**

FASB ASC 820 defines fair value and establishes a framework for measuring fair value and establishes a fair value hierarchy which prioritizes the inputs to the inputs to the valuation techniques. Fair value is the price that would be received to sell an asset or amount paid to transfer a liability in an orderly transaction between market participants at the measurement date. A fair value measurement assumes that the transaction to sell the asset or transfer the liability occurs in the principal market for the asset or liability or, in the absence of a principal market, the most advantageous market. Valuation techniques that are consistent with the market, income or cost approach, as specified by FASB ASC 820, are used to measure fair value.

**Fair Value Hierarchy**

FASB ASC 820  specifies a hierarchy of valuation techniques based upon whether the inputs to those valuation techniques reflect assumptions other market participants would use based upon market data obtained from independent sources (observable inputs), or reflect the Company's own assumptions of market participant valuation (unobservable inputs). In accordance with FASB ASC 820, these two types of inputs have created the following fair value hierarchy:

Level 1 - Quoted prices in active markets that are unadjusted and accessible at the measurement date for identical, unrestricted assets or liabilities.

Level 2 - Quoted prices for identical assets and liabilities in markets that are not active, quoted prices for similar assets and liabilities in active markets or financial instruments for which significant inputs are observable, either directly or indirectly.

Level 3 - Prices or valuations that require inputs that are both significant to the fair value measurement and unobservable.

FASB ASC 820 requires the use of observable market data if such data is available without undue cost and effort.

The Company measures fair value as an exit price using the procedures described for all assets and liabilities measured at fair value. When available, the Company uses unadjusted quoted market prices to measure fair value and classifies such items within Level 1. If quoted market prices are not available, fair value is based upon internally developed models that use, where possible, current market-based or independently-sourced market parameters such as interest rates and currency rates. Items valued using internally generated models are classified according to the lowest level input or value driver that is significant to the valuation. Thus, an item may be classified in Level 3 even though there may be inputs that are readily observable. If quoted market prices are not available, the valuation model used generally depends on the specific asset or liability being valued. The

determination of fair value considers various factors including interest rate yield curves and time value underlying the financial instruments.

## Income Taxes

Deferred tax assets and liabilities are recognized for temporary differences between the financial reporting basis and the tax basis of our assets and liabilities.  Deferred taxes are recognized for the estimated taxes ultimately payable or recoverable based on enacted tax laws.  Allowances are recorded if recovery is uncertain.

## Earnings per Common Share

Basic net loss per share is computed using the weighted average number of common shares outstanding during the period. Basic and diluted earnings per share are the same as outstanding options are antidilutive. Dilutive common equivalent shares consist of options to purchase common stock (only if those options are exercisable and at prices below the average share price for the period) and shares issuable upon the conversion of the Company's securities.

## Impairment

Intangible assets with estimable lives and other long-lived assets are reviewed for impairment annually or whenever events or changes in circumstances indicate that the carrying amount of an asset or asset group may not be recoverable. Recoverability of intangible assets with estimable lives and other long-lived assets is measured by a comparison of the carrying amount of an asset or asset group to future net undiscounted pretax cash flows expected to be generated by the asset or asset group. If these comparisons indicate that an asset is not recoverable, the impairment loss recognized is the amount by which the carrying amount of the asset or asset group exceeds the related estimated fair value. Estimated fair value is based on either discounted future pretax operating cash flows or appraised values, depending on the nature of the asset. Judgment is required to estimate future operating cash flows.

## Recent Accounting Pronouncements

*ASU 2010-29.* In December 2010, the FASB issued clarification of the accounting guidance related to disclosure of pro forma information for business combinations that occur in the current reporting period. The guidance requires companies to present pro forma information in their comparative financial statements as if the acquisition date for any business combination that occurred in the current reporting period had occurred at the beginning of the prior year reporting period. The Company adopted this guidance effective January 1, 2011. ASU 2010-29 is a disclosure only clarification and its adoption had no impact on the Company's financial condition or results of operation. The Company has included the disclosures required pursuant to this guidance in this Report.

*ASU 2011-04.* In May 2011, the FASB issued ASU 2011-04, which amends ASC Topic 820, *Fair Value Measurements and Disclosures*, to achieve common fair value measurement and disclosure requirements under GAAP and International Financial Reporting Standards ("IFRS"). This standard gives clarification for the highest and best use valuation concepts. The ASU also provides guidance on fair value measurements relating to instruments classified in stockholders' equity and instruments managed within a portfolio. Further, ASU 2011-04 clarifies disclosures for financial instruments categorized within level 3 of the fair value hierarchy that require companies to provide quantitative information about unobservable inputs used, the sensitivity of the measurement to changes in those inputs, and the valuation processes used by the reporting entity. The Company is currently evaluating the newly prescribed disclosures but does not expect they will have a material impact on the consolidated financial statements.

*ASU 2011-05.* In June 2011, the FASB issued ASU 2011-05, which amends the guidance in Topic 220, "Comprehensive Income," by eliminating the option to present components of other comprehensive income ("OCI") in the statement of stockholders' equity. Instead, the guidance now requires entities to present all non-owner changes in stockholders' equity either

as a single continuous statement of comprehensive income or as two separate but consecutive statements of income and comprehensive income. The components of OCI have not changed nor has the guidance on when OCI items are reclassified to net income. Similarly, ASU 2011-05 does not change the guidance to disclose OCI components gross or net of the effect of income taxes, provided that the tax effects are presented on the face of the statement in which OCI is presented, or disclosed in the notes to the financial statements. The Company adopted this guidance effective January 1, 2012. The adoption of this guidance is not expected to have an impact on the Company's consolidated financial statements.

*ASU 2011-8.* In September 2011, the FASB issued ASU 2011-8, which amends ASC 350, *Intangibles-Goodwill and Other.* The amendments in this ASU give companies the option to first perform a qualitative assessment to determine whether it is more likely than not (a likelihood of more than 50.0%) that the fair value of a reporting unit is less than its carrying amount. If a company concludes that this is the case, it must perform the two-step goodwill impairment test. Otherwise, a company is not required to perform this two-step test. Under the amendments in this ASU, an entity has the option to bypass the qualitative assessment for any reporting unit in any period and proceed directly to performing the first step of the two-step goodwill impairment test. The Company adopted this guidance effective January 1, 2012. The adoption of this guidance is not expected to have an impact on the Company's consolidated financial statements.

*ASU 2011-11*. In December 2011, the FASB issued ASU 2011-11. The amendments in this ASU require companies to disclose information about offsetting and related arrangements to enable users of its financial statements to understand the effect of those arrangements on its financial position. The ASU is required to be applied retrospectively for all prior periods presented and is effective for annual periods for fiscal years beginning on or after January 1, 2013, and interim periods within those annual fiscal years. The adoption of this guidance is not expected to have an impact on the Company's consolidated financial statements.

**4.  Long-term debt** The Company's long-term debt consisted of the following as of December 31, 2016 and December 31, 2015:

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Loans from principals | $1,645,274 | $ 1,645,274 |
| Total Debt | $1,645,527 | $ 1,645,274 |
| Less current portion | 0 | 0 |
| | $1,645,527 | $1,645,527 |

Long-term debt matures as follows:

| Years | December 31, 2016 Amount | December 31, 2015 Amount |
|---|---|---|
| 2015 | $0 | $0 |
| 2016 | 0 | 0 |
| 2017 | 0 | 0 |
| 2018 | 0 | 0 |
| 2019 | 0 | 0 |
| Thereafter | $1,645,527 | $1,645,527 |
| | $1,645,527 | $1,645,527 |

**5.  Line of Credit**

The Company currently finances its operations through loans form Investors and issuance of restricted common in lieu of cash payments. No new funding source has been obtained for the Company.

**6.  Stockholders' Equity**

**Capital Structure**

The Company is also authorized to issue 800 million shares of preferred stock. As of December 31, 2016 and December 31, 2015, there were 577,964,967 and 564,464,967 shares of common stock issued and outstanding, respectively. As of December 31, 2016 and December 31, 2015, there were 50,000,000 shares of Preferred Series A and 200,000,000 shares of Preferred Series B shares issued and outstanding at both periods..

**Common Stock Issuances**

**Issued in Acquisition**

There were no shares issued for acquisition in the years ending December  31, 2016 and December 31, 2015.

**Issued for Services**

On February 16, 2016, the Company issued 3,000,000 to Baja Trip & Associates for consulting services. The Company issued 5,000,000 shares on March 29, 2016 for consulting services in association with the development of its website to K. Lliev.

On November 9, 2015 Luchezar Ivanov and Kamelya Tsoklinova were each issued  2,500,000 shares for consulting services. There were no shares issued for services during the three month period ending March 31,2016 or the year ending December 31, 2015.

**Issued for Cash**

During the three month period ending March 31, 2016 M. Matseva and L. Matseva  were issued 1,000,000 shares under two separate subscription agreements for a total of $4,200 on March 29, 2016 and Dow Jones Link was issued 500,000 shares in exchange for a direct payment to the Company's vendor of $500.00 on the same date.

 On September 30, 2015 the Company issued 3,500,000 shares under a subscription agreements  to Denicia Gadgeva for $3,000. On December 15, 2015, the Company issued 5,500,000 shares to Bryan Andrew Davis for $5,000. under a subscription agreement.

**7.  Stock Based Compensation**

There was no stock based compensation in the periods ended September 30, 2016 or December 31, 2015.

**8.  Earnings Per Share ("EPS")**

The following table sets forth the computation of basic and diluted income per share for the periods ended September 30, 2016 and December 31, 2015. Basic earnings per common share is calculated by dividing net income available to common shareholders by the weighted average number of shares of common stock outstanding during the period.

|  | For the periods ending | |
|---|---|---|
|  | December 31, | December 31, |
|  | **2016** | **2015** |
| **Basic (Loss) Earnings Per Share** |  |  |
| Undistributed net (loss) income | ($493,029) | ($515,988) |
| Less: Dividends declared | - | - |
| Basic undistributed net (loss) income –attributable to common shares | ($493,029) | ($515,988) |
|  |  |  |
| **Denominator:** |  |  |
| Basic weighted average shares outstanding | 572,704,693 | 551,752,638 |
| Basic (Loss) Earnings Per Share — attributable to common shares | $          (0.00) | $          (0.00) |

## 9.  Income taxes

The Company has experienced net losses for the years ended December 31, 2016 and December 31, 2015 and no tax liability has been reported.

### Uncertain Tax Positions

The Financial Accounting Standards Board issued Interpretation No. 48, "Accounting for Uncertainty in Income Taxes - an interpretation of FASB Statement No. 109, Accounting for Income Taxes" ("FIN No. 48") which was effective for the Company on January 1, 2007.  FIN No. 48 addresses the determination of whether tax benefits claimed or expected to be claimed on a tax return should be recorded in the financial statements.  Under FIN No. 48, the Company may recognize the tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities based on the technical merits of the position.  The tax benefits recognized in the financial statements from such position should be measured based on the largest benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement.  FIN No. 48 also provides guidance on de-recognition, classification, interest and penalties, accounting in interim periods and disclosure requirements.  The company has not had a tax audit for its open tax years 2008 through 2016.

## 10. Related Party Transactions

The President of IMMB, Harry H. Zhabilov, is the guarantor on the lease for the facility in which the Company operates.

During the quarter ended March 31, 2016 the Company repaid $3,000.00 on the outstanding balance of Loans from Harry Zhabilov.

For the year ended December 31, 2015 Harry Zhabilov loans to the Company increased by $12,720.00. There were no other material related party transactions.

21

## 11. Concentrations and Risk

There is no concentration of clients. The Company operates in a highly regulated industry and there is no guarantee that the Patented Treatment will gain regulatory approval.

## 12. Commitments and Contingencies

### Legal Proceedings

The Company is currently not a party in any legal matters arising from its ordinary course of operations.

## 13. Subsequent Events

The Company's treatments entered into Phase Three Clinical Trials in Bulgaria for 150 patients. The final results from the successful Phase Three Clinical Trials were received in the fourth quarter of 2016. These results showed significant improvement to all salvage patients receiving the treatment, with approximately 80% showing undetectable viral loads of the HIV/Aids virus in subsequent blood test as well as marked improvement to the Immune System with increased CD 4 and T Cell counts in over 67% of the patients receiving the treatment. Based on the successful compilation of the Clinical Trials IMMB BG has applied for the permit for manufacturing and sale of the Treatment (Phase IV) in Bulgaria in the fourth quarter of 2016. As part of the permit approval process the Company entered a seven-year contract for the manufacturing of the Immunotherapy Treatment with Pyramid Laboratories, Inc. located in California. Financing has been secured by IMMB-BG and construction of a manufacturing facility has begun in Bulgaria.

**Item 6). Describe the Issuer's Business, Products and Services**

A.  The Company is currently in the research and development stage of operations and has successfully completed phase Three of clinical trials on its Immunotherapy Treatment for the HIV/Aids virus in Bulgaria. The Company's 49% owned subsidiary IMMB BG has filed, in the Fourth Qtr. of 206, for the permit to allow sale of the treatment to Aids patients with the HIV/Aids virus in Bulgaria.

B.  The Company was organized on April 11, 2000 as a Nevada corporation.

C.  The Company's primary SIC Code is 541711.The Company's Secondary SIC Code is 541990.

D.  The Company is a Calendar year reporting entity.

E.   Immunotech Laboratories Inc. a Nevada Corporation incorporated on April 11, 2000, is an organization with full indefinite licensing rights of the Irreversible Pepsin Fraction (IPF) peptide molecule for the specific treatment of the HIV/AIDS indication. The Company is dedicated to the commercialization of these License rights of the IPF for the treatment of Aids and Hepatitis C as well as potential other treatments for life threatening diseases. IPF is a peptide molecule that has a strong affinity to bind with the HIV virus' peptide components identified as gp41 and gp120 antigens, rendering them as super antigens, and taking away from them their stealthiness and their capability to destroy the immune system.   In addition to this mechanism of action, IPF will also enhance and upgrade the immune system components and criteria, as such resulting in a double impact approach of both behaving as a novel fusion inhibition treatment as well as an immuno-modulator. Immunotech Laboratories Inc., in contrast to other biotech start-ups is based on a proven technological foundation and has scientifically demonstrated that its novel molecule IPF for the treatment of HIV/AIDS is a viable alternative and complimentary treatment product.

ITV, produced by Immunotech Laboratories, Inc. is a brand new specific protein for the treatment of HIV and other viral infections. For the first time a naturally occurring strong binding with gp41 HIV-1 envelop protein "in vitro" was demonstrated.

Current market sales indicate that the majority of products show annual sales of 100 plus million, with a significant number ranging from 300 up to 1 billion dollars in annual sales. Many of the major drug companies, have entered into partnership agreements with new comers, or with companies in different stages of development in the research pipeline, combining current ARVs with new drug families that impact the HIV/AIDS virus through different mechanisms of action.  Partnerships of this nature are a direct result of the major seven Pharmas who control a market with a potential of reaching $ 15 billion in year 2012, prevent their control and stake in the market share from sliding, due to numerous issues, among which it is important to note, compliance to the drug regimen, adverse reactions to their chemotherapeutic agents impacting the human organs, cost and eventual viral resistance.

In summation our product's differentiation is based on:

1-  Minimal and minor side effects
2-  Zero toxicity issues
3-  Tremendous cost savings
4-  Short and limited treatment cycle
5-  Easier Compliance adherence
6-  Zero risk of viral resistance and mutation

<u>Item 7). Describe the Issuer's Facilities</u>

Immunotech Laboratories, Inc. operates out of a 1,655 sq. ft. facility located in Monrovia, CA in Hamby Industrial Park under a two year lease expiring on March 31, 2015. All lease payments are current under the lease. The President Harry Zhabilov is guarantor on the lease. The Company currently employs 1 full time individual.

<u>Item 8). Officers, Directors, and Control Persons</u>

A.    <u>Names of Officers, Directors, and Control Persons</u>

1.) Harry H.  Zhabilov – President and Chairman of the Board and owner of  40,000,000 shares of Series A Preferred (66%) , Series B Preferred 80,000,000 shares of Series B Preferred (40%) and 6,173,000 Common shares (less than 4%),
2.) Valentine Iordanov Dimitrov – Director
3.) Dimitri Savov -  owner of 120,000,000 Series B (60%) and 73,000,000 Common shares (12.7%).

B.    <u>Legal/Disciplinary History.</u>

1.  A conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding (excluding traffic violations and other minor offenses); None

2.  The entry of an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoined, barred, suspended or otherwise limited such person's involvement in any type of business, securities, commodities, or banking activities; None

3.  A finding or judgment by a court of competent jurisdiction (in a civil action), the Securities and Exchange Commission, the Commodity Futures Trading Commission, or a state securities regulator of a violation of federal or state securities or commodities law, which finding or judgment has not been reversed, suspended, or vacated; None

4.  The entry of an order by a self-regulatory organization that permanently or temporarily barred suspended or otherwise limited such person's involvement in any type of business or securities activities. None

C.    <u>Beneficial Shareholders</u>

1.) Harry H.  Zhabilov – President and Chairman of the Board and owner of 40,000,000 shares of Series A Preferred (66%) , Series B Preferred 90,000,000 shares of Series B Preferred (40%) and 16,678,000 Common shares (less than 3%),

<u>Item 9). Third Party Providers</u>

<u>Legal Counsel</u>
Name: Jackson Morris
Firm: Rule 144 Solutions
Address 1: 3116 w North A Street
Address 2: Tampa, Florida 33609
Phone: 813-892-5969
Email: Jackson.morris@rule144solutions.com

<u>Accountant or Auditor</u>
Name: Kelli Austin
Firm: Uncommoncent / Formerly Camelot Financial Group
Address 1: 3540 W Sahara Suite 101
Address 2:  Las Vegas, NV 89101
Phone: 702-497-0736

Email: kdaustin27@aol.com

**Item 10). Issuer Certification**

I, Harry H. Zhabilov certify that:

    1. I have reviewed this annual disclosure statement for the year ended December 31, 2015 Immunotech Laboratories, Inc.

    2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

    3. Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

January/25/2017

/s/ Harry H. Zhabilov
Chief Executive Officer
Harry H. Zhabilov

/s/ Hary H. Zhabilov
Chief Financial Officer
Harry H. Zhabilov

(Digital Signatures should appear as "/s/ [OFFICER NAME]")